May it please the Court. I'm Matt Wilson. I represent the plaintiff of Pelland, Oregon Metallurgical Corporation. The plaintiff's claim is for breach of the obligation of common carriers by rail to deliver with reasonable dispatch. The defendants are the originating and the delivering carriers of shipments of titanium tetrachloride, which is the raw material feedstock plaintiff required to manufacture titanium sponge in its single-purpose plant. Can you tell us in dollars and cents what your damage was? The nearest round number is $2 million. And how do you get there? How do you calculate that? By taking the lost production caused by failure to deliver timely and multiplying – I'm sorry. You take the amount of the lost production. You value it. This is titanium sponge that you could have made but didn't because it didn't have the material. Correct. And then you subtract the incremental cost that would have been incurred in producing it. And that's set out in Bruce McFarland's expert reports, the original and the supplemental. There are several different theories of how you measure the damages. That may be yours. There may be others as well. That's correct. And I don't think that that issue was really properly reached below. How do you determine them? You actually bought replacement goods? Well, as a matter of fact, there were replacements that were purchased. But I don't think that's a necessary part of the damage analysis. That argument about how you measure the damages – the first question, did you have damage? The amount may be a matter of dispute as to the measurement, I suppose. But you have your theory of measurement. Yes. I suppose one question is, are there any damages at all? If you were – and I think this is your opponent's theory – if you were not going to sell it for a profit, it doesn't matter whether you ever made any of your product at all. If you were not a business, you'd have no damages because you weren't getting any profit. You were selling it to your related corporation for the cost of manufacturing. So that you never would have any damages. Well, that argument which defendants made below and they make here isn't even correct factually, and that's clear from the McFarland damage reports. He calculated the lost production based on information that is in the record. It was a calculation that was done by Greg Gosling. And then he calculated the incremental cost it would have taken to produce that production that wasn't made. And then when you subtract that from the fully allocated average cost, which would have been paid by the corporate relatives, there's still a substantial profit of $1.68 a pound. Well, I must say I have a little trouble following all the various methods of arriving at damages. I suppose that's something a jury would ultimately conclude if they decided there was a breach and if they decided all the legal questions leading up to your entitlement. That's true. I imagine you would make that argument. The company would make a different argument about what your damages are. We don't expect them to make the same one. Well, they certainly could make the argument that there are no damages. We would expect them to make it over that argument. If you get over that argument, then how you actually measure it is something that I guess the jury would decide. That's correct. And we think that the damage reports of Mr. McFarland are more than ample to support the inference that there is, in fact, real damage and there's a way to measure it. There are two issues that were raised by the defendant's motion for summary judgment. The first basis on which they moved was that these were special damages that Ormet was claiming and that they did not have the notice that they needed to have in order to be responsible. And on that issue, the district court said that was an issue of fact. They were not fact. That's correct. And we think that the district court did conclude that they were special damages, and we think that that is wrong, and the judge was misled by the language in the contract that said that it's subject to Texas law. Now, that's an understandable conclusion that that provision would mean what it says, but that's not the case in this context because it's perfectly clear in the case of interstate rail shipments that they are subject to the Carmack Amendment, and that is federal common law, so that the apparent choice of Texas law in the contract was not effective. And that misled the court into looking at Texas cases about what special damages and what are general damages when, in fact, there are federal cases in the interstate rail context that make it clear what general damages are, and they are the ordinary and natural consequences of the breach of the duty to transport with reasonable dispatch. Those cases are cited at page 22 of our opening brief, and conversely, as this court described special damages in the Contempo Metal Furniture case, they are damages the carrier did not have reason to foresee as the ordinary and natural consequences of a breach when the contract was made. Now, the product that was the subject of the movement here was the feedstock that translated directly into production in the plaintiff's manufacturing process. You take four pounds of titanium tetrachloride, and you run it through the manufacturing process, and you have one pound of titanium sponge. It is necessarily the result when you fail to make the deliveries timely that the loss of the feedstock will cause a corresponding loss in production, and that's the damages which we see. Is that a legal question or a factual question, whether they should have known this is a natural consequence of the breach? Well, it's part both. I think it's so clear factually that it's nearly a legal question. And that's the question. How much knowledge do you presume the shipper has of the business of the recipient? The carrier? We have cited in the... We have cited in the briefing the knowledge that they have. We think that the fact that this is a chemical manufacturing process, this is the business the railroads are in, they know that you have to have a feedstock. Clinton Watkiss, who... But do they know that you have to increase your production, or do they know that it would do harm to your business if you don't increase it, you can't wait? Sure, sure, and they received specific notice from our supplier. But before the contract was entered into, Clinton Watkiss, who negotiated, said that he knew that you're going to slow down production if you don't get feedstock there. That's a matter of basic economics. So this follows as the night of the day that if you don't get the feedstock to the chemical manufacturing plant, it's going to cause a loss of production. And that's what the case is about. No, it causes slowdown in production. Maybe if you're manufacturing automobiles and there's a slowdown, and you sell them a month later, it doesn't do any good. No, but in this case, you run your manufacturing plant around the clock, and if you didn't have the opportunity to produce the product during the time because of lack of product, it's lost forever. Is there a meaningful difference between special damages, as to which there's been sufficient notice given, and general damages? You know, I don't think there is. I've never understood the difference. I wonder why that's part of the law at all, because it all comes down. You have to have the notice of special damages. Well, what it turns on, whether you call it special damages or general damages, is did the person you're trying to charge them with have reason to believe that this would happen? And the answer to that is yes, when you're talking about the failures to deliver feedstock to a chemical manufacturer. And Judge Haggerty reached that result. Well, I get to include some questions and raise some questions. If it's enough notice just that you have reason to know, that would make it general damages. It also would be enough notice for special damages. That's right. Unless you require more for special damages than just the reason to know. It seems to me that when you come out the same place, I'm not sure what difference it makes. Well, that may be. Unless the answer is that you require more once you decide it's special. You require more than you would have just for the reasonable knowledge required for general. Well, that's do you require more? Are you saying that there is authority that would suggest that that is required? But once you get to the point where you are asking the question, does the person with whom I am going to charge responsibility have reason to believe that this will happen? If there's a default, that's really the only inquiry. And that inquiry is Judge Haggerty got there saying that they were special damages and there was sufficient notice. I don't think that they are special damages under the Carmack Amendment cases. But in any case, we come out to the same place. The basis on which the summary judgment was granted was that the defendant contended there were no legally cognizant damages because all of the product was transferred to corporate relatives. And the defendants now contend on the appeal that all or most of the sponge plaintiff would have manufactured would have been transferred to the corporate relatives. And plaintiff was fully reimbursed because it received its full average cost for the transfers. And Ormetz's failure to establish what portion of the lost production could have been used by it to manufacture titanium products entitles defendants to summary judgment. And the plaintiff's expert reports are legally insufficient. And the defendants did not assert a pass-through defense. But if their position is so construed, the defense would apply. And that any loss was really suffered by the corporate relatives, not by the plaintiff itself. Many of these arguments are outside the issues that were raised in the summary judgment motion. The summary judgment motion did not require plaintiff to prove its damages in detail. Plaintiff would need to do that if it had moved for summary judgment. But it did not. Defendant's motion for summary judgment was predicated on defendant's contention that plaintiff transferred all of its production to its corporate relatives. But once the defendants admitted, and they did, in the response to the concise statement of material fact number 20 that that was not the case, and that in fact the plaintiff would have used some of the sponge to manufacture its own titanium products, the defendants weren't entitled to summary judgment on the basis on which they moved. And even if their underlying position were correct, which it was not, the response to the concise statement of material fact number 20 is in ER 408-09. It precluded the summary judgment award below. And even if the analysis the defendant used were correct, it would need to be tried at trial how much of the sponge plaintiff would have used to make its own titanium products. The defendant's factual contentions are disproved by the McFarland damage reports. He quantified the lost production. He calculated the incremental cost of producing the lost production. He calculated the value of the lost production. And he determined how much the damages were after subtracting the incremental cost from that. The factual error of defendant's contention that plaintiffs suffered no actual loss as a result of these transfers is also clear from the McFarland reports, because he shows what the average cost would have been to produce a pound of sponge if the lost production had been included. And that number was a $3.33 a pound number. And the incremental cost of producing it was $1.68 per pound less. So those were damages as a factual matter for that product that was transferred to the corporate relatives. The McFarland reports are more than adequate to establish damages for purposes of avoiding summary judgment. The defendant's suggestion that plaintiff needed to show how the lost production would have been used is particularly inapt, because lost production by definition does not exist. So showing how it was used is not a realistic requirement. And the fact that defendants caused the problem, they should not try to take advantage of it. In addition to the factual inadequacies of the defendant's position, the position is legally indefensible. The defendants say they did not assert a pass-through defense, but it is clearly the effect of the position they take. It is no part of a plaintiff's claim to show that it was not reimbursed entirely or in part or by a third party for damages that the defendant inflicted. The defendant's authority for application of the defense is their purported distinction of all the cases in which it has been rejected as though there were some underlying platonic ideal favoring the pass-through defense. But no case has been cited accepting it. And in the context of claims for damages for breach of a common carrier's duty to transport with reasonable dispatch, the rule that the carrier is liable to the holder of the bill of lading for the full actual loss and damage caused by it precludes application of the pass-through defense. Under the Carmack Amendment, and the cases decided under it, the carrier is obligated to compensate the holder of the bill of lading or the person entitled to recover on it for the full actual loss for delay in the shipment of goods. Common carriers cannot be permitted to avoid that liability by showing that the customer was reimbursed all or part of its damage by someone else without doing violence to the statutory scheme. The damage recovery rule is set forth in any number of cases that are cited in the briefing, including Hector Martinez and company. And so, thank you. Thank you, Terry. May it please the court. My name is Richard McGid, and with me is Wendy Margolis on behalf of the attorneys. I'd like to focus on what Judge Reinhart indicated is the major issue here, whether there was any damage at all to the appellant in this case, Ormet. And our position is there was none. There was none because Ormet had a unique arrangement with its sister corporations by which, and this was a preexisting arrangement, by which it agreed with the sisters that all of the sponge that it sent to the sister corporations would be transferred at their full cost. And to get around this, appellant has suggested that somehow the lost production cost, which they've identified as $3.34 per pound, you would have been able to determine lost profit or some sort of a damage by reducing that by the incremental cost, which they've calculated to be $1.68 a pound. Our position is simply cost is cost. And if it costs $3.34 to produce the sponge, the sister corporations would take it at $3.34. I'm going to ask you, did they replace any of the materials you didn't send them? There is no evidence in the record whatsoever of any re-procurement or cover purchased from the outside. None. And their damage, Your Honor, is simply... Is there evidence as to what it would have cost them to replace it? There is. They produced evidence that if they went outside and were to purchase it, it would cost $3.90 per pound. So there is a difference between the market price. Yes. Okay. But your theory... Let me ask what I asked you a moment ago. Is it your theory that if your failure to ever deliver anything drove them out of business, they would not have any damage because they never made any profit anyway? Well, let me try to answer. Before I get to that, let me answer one other question. Their agreement was not just to transfer at cost what they produced, but also any sponge that was acquired would go across at cost as well. So I want to be clear about that. By production, our acquisition would go across at cost. Our position would be that if they were driven out of business, if they had to shut down and could not manufacture sponge, it would be an entirely different situation because then they would be hit with overhead and costs that they couldn't transfer to the... What? They wouldn't be hit with anything. They'd no longer be in business. They'd be out of business. And whatever their overhead costs were, whatever their damages... But they'd save their costs. They'd have no more costs at all. Well, that's right. If they shut down at that point... They're going to be grateful to you if you put them out of business. I don't know if they'd be grateful. But they did, Your Honor, go out of business several months later for reasons unrelated to this contract dispute. They couldn't compete on the international market. But doesn't that suggest just the problem? I mean, how can it be if somebody's driven out of business and as a result doesn't pay other creditors and so forth, you get a zero there and as a result your client wouldn't be liable for anything? Well, that's... On the face of it, I have to say it's difficult to fathom the idea that no harm, no foul. I understand, Your Honor. And believe me, this is something that I've anticipated because it just seems that if you were to be late and we contend that our shipments were not late for the reasons that they say, but somehow it would seem unfair that somebody could, without any possible answerability, be able to breach a contract and have no answerability. Well, the answer is twofold. One, these are big companies. Ormet is part of a large conglomerate. These are huge, multinational conglomerates. The railroads are also very large. All of them are Fortune 500 companies. They negotiate their contracts for their own reasons. And one of the points is they got benefits by having this flow through or this pass-through arrangement to the sisters, perhaps tax, perhaps other reasons, that would allow the product to go from one company to another without being hit by taxes at that intermediate stage. But the second point is they could have had a cause of action and there's no reason why it couldn't have been done, and that is on a third-party beneficiary basis. I'm not suggesting how they would go about doing it because that's their business, but clearly if they had come to the railroad and said, Look, our business is changing. When we contracted with you in July of 1998, it was just between the railroads and Ormet. Ormet at that time was an integrated titanium production company which created the sponge and they took the sponge and turned it into slabs or ingots of titanium and sold those. The business changed in the middle of 1999 to the point where they were just the production department for sponge, and they were taking the sponge and sending it out to the corporate relatives at cost. If they had come to the railroads at that time and said to the railroads, Look, we have a new arrangement here. We're not in a position where we're going to be able to have any profit or loss. Our arrangement is settled with our sister corporations. Here's the new arrangement, and our sister corporations are the real party in interest because they're the ones that are going to be in a position to get the sponge and make the ultimate product. At that point, they could have negotiated amendments to the contract. The railroad, for its purposes, would be interested in the foreseeability issue. For example, if right now when they contracted in 1998, the railroad understood what the risks were. This is a Hadley versus Baxendale issue. They understood the risks of what would happen if we, the railroad, get the raw product too or met late. We can have an idea of what would happen.  Well, I have to stop you there because it seems to me highly unlikely that the railroad filed away the fact that, hmm, these guys actually sell for cost so they can't suffer any loss so we can abuse them as much as they want because they're not going to be suffering any damage. The railroad wasn't counting on that. It can't claim that it was fooled by the change in organization on the ORMET side that somehow it's exposed greater than it used to be. Indeed, as you just played out the scenario, it was exposed at the beginning because ORMET itself would have suffered the loss. So there hasn't been a change in circumstances that worsened the railroad's case, and there's no reason to expect anybody to come in and talk to the railroad about how the ORMET side has reorganized its business. I can't imagine anybody would go in to talk about that. Well, only if they wanted to establish the fact that there was a third-party beneficiary relationship. Why would that matter? Why is that something to take up with the railroad? It would be up to them to do that, to notify us of the circumstances because right now if the product is moving through to the sister corporation and they're making golf clubs or tennis rackets or something else, that would be something that the railroad would have to assess in terms of the risk and the rates that it's charging. As you read the Contempo case decided by this circuit, it talks about the fact that when the shipper and the carrier get together on a contract, the elements of foreseeability are established at that point. What are the risks to the railroad? What is it going to do in terms of its rate? Well, as you just described it at the time that this started, ORMET was an integrated company. Yes. So at that time, the railroad assumed that it was bearing the risks because ORMET was. So if anything, the change in facts at the current posture, the case benefited the railroad because no longer was ORMET fully integrated, it was selling for cost. You're trying to claim benefit of that, but you're not disputing at the time the contract was initiated, ORMET was in a position to suffer damages. Well, ORMET was in a position to suffer damages at the beginning of the contract. When they changed in midstream, they lost the ability to either make a profit or suffer a loss. That was the decision they made and was not communicated to the railroad. So why should the railroad be able to get benefit from that? Railroad wasn't counting on it. So you talk about the railroad assessing its risk and calculating rates. As far as the railroad knew, ORMET was still the same as it was. That's exactly correct. But the issue here is did ORMET in this case suffer any damage or any loss? And I think the answer is clearly if there was loss, as Judge Hagerty said in his opinion, it would have been with the sister corporations, and they would be in the position to assert a claim, not ORMET. What we have here is not a situation where there's a wrong without a remedy, but rather there's a wrong without the right party to assert that wrong. And that's the difference. Let me ask you this. If a charity or the Boy Scouts or any non-profit corporation ordered things shipped by the railroad, and they give this product away to help poor people, they would have no damages? No. Wouldn't the damages be what they would have to pay to replace it? Absolutely. A charitable organization can make profits and they can suffer losses. This is a situation where it's the same. Well, I'm saying they don't. They give away the product. They don't lose any money when they don't make it. They're better off. But in your hypothetical, they go out and buy a replacement product and then give it away? Is that what you're saying? No. I said would the damages be? That's another question. Would you have to do it? Would the damages be the difference between the replacement cost? And then I'll come to the next question. The damages, would not the damages be the difference between what it would cost them to go out and get that product and replace it, even though they're not going to make any profit? Well, that would be correct. But in this case, the replacement cost is also something that was going to be transferred over to the sister corporation. So it's on both sides. But you're saying they're not going to make a profit? That's correct. All right. And I'm saying in the Boy Scout case, they're also not going to make a profit, but they would have damages. But they would be subject to a loss because there's no one there to pick up their costs. In other words, in this situation, assume one pound was transferred to the sister corporation. The per unit cost would be a million dollars for that one pound of sponge, and that would be the per unit cost because that one pound would have to absorb the entire spectrum of cost. That one pound would go over to the sister corporation. The sister corporation would send back a million dollars. It would be a book entry because, as we pointed out, they're both controlled by the same corporate parent, the sister corporation and ORMET. This is really just a right hand to the left hand, and we're not really looking at arm's length. This is not an arm's length transaction. It's between two wholly owned companies with a parent. And this is merely a movement of sponge from one sister to the other with a book entry of cost. And in that sense, there is simply no lost profit and no possibility for loss or for gain. That's the way they structured their organization for dealing with this particular situation. And our position is that the trial judge was absolutely correct. This is a very unique situation. And to get back to the judge's question, this is not something that occurs every day or very frequently at all. This is a very unique situation. It's as if you had a pancake house and you cut it in half and had the people who stir the batter in one company, and they would pass on the batter to the other side through the wall to the other part of the company who would cook up the pancakes. The product is moving through at cost to the place that's actually making the pancakes. But the question of loss or profit is really not there because they're just transferring things across. And that's exactly, if you want to envision it, it's simply like that. There are two corporations that were both purchased by the same parent, and they were consolidated together except for the corporate formality. And this was almost as if you took a corporation and you cut it in half and named one corporation A and corporation B and just moved product from one to the other. There is no harm to the corporation that sued us, Forman. It can't be. And they've come up with this notion of the differential between the unit cost versus the incremental cost. Any cost that's assumed or obtained moves right over and is transferred to the sister corporation. And the other issue in this case is the product that was retained in-house, and this is an issue that's somewhat different. There is testimony in the record that some sponge was not transferred over, but was retained in-house for, or meant to. I understand they're not making any claim for that anymore. Is that your understanding? Well, it's unclear to me whether they are or they aren't. But the same with some of the damage issues are even difficult, somewhat difficult to penetrate. But what's missing is when they say that the court asked in a minute order, tell me what was retained versus what was sent over, and they were unable to state that. We don't know what it is. There's a failure here of evidence to show what was retained and what was done with what was retained. I thought in that colloquy they said, in effect, to the judge, don't worry about it. I thought so, too. But, you know, I'm just not sure. This whole damage issue is a little bit unclear to me, and I'm living through it, so I don't know fully the answer. If they've abandoned it, then it's abandoned. If it's not, then our position is there's a failure of evidence, because you can't go to a jury tomorrow and say to the jury, look, we've lost some production, and give us a damage award. Maybe Mr. Wilson will tell us. And the final point here is on this issue of the special damages. And we think, first of all, it's a premature issue. The court we look- Well, if there are no damages, you don't have to worry about whether they're special or general. Right, exactly. And the court ruled against us on this point. It's really a subsidiary issue on an issue that Mr. Wilson won on summary judgment. But there is one unique fact here, and that is that this contract, this transportation contract, was established under what's known as the Staggers Act, which allows the shipper and the carrier to agree on a free market type of contract, which is not necessarily governed by the Carmack Amendment. In this case, the Carmack Amendment was incorporated for purposes of determining liability. The Carmack Amendment has its own body of law. But Texas law is adopted as the governing and controlling by which the contract is going to be construed. That law, under Texas law, special damages has a very strong meaning, which is much different than the meaning that attaches here in the Ninth Circuit in the forum. And there, in Texas, the standard is there has to be a conclusive presumption of foreseeability in order to get general damages. It's a very unique and a very strict standard, which doesn't pertain here. And, in effect, it means that, as a matter of law, the type of damages that they're seeking had to be available, or the type of the specie of claim for damages has to be conclusive. Are you saying that we should not decide the issue of whether, assume you lose on the first question, and we say there are some, there are damages. Are you saying that, in that case, we should not then proceed to the second question and say whether they are general or special? Well, I don't think you have to judge. I mean, certainly you have the discretion to go as far as you want on any of it, including the issues that weren't even, there was one issue that wasn't even decided below. But we don't believe it's necessary, primarily because there are no damages to begin with. Well, obviously there are no damages. That ends it. Yes. Okay. Thank you. There were damages, and you can see what they were in the McFarland reports. I want to follow up on Judge Silverman's colloquy with Mr. McGead. And I think you were referring to the oral argument on summary judgment in the early part where, in response to his questions, I said something that could have suggested that we were giving up on the notion that there was any damage with respect to titanium that was used in our own manufacturing processes. Later on, that question came up again, and I had the chance to make clear that I had not communicated well the first time and that, in fact, the significance of the fact that we did use some sponge in our own manufacturing process was that, as a logical proposition, it precluded the award of summary judgment that Judge Haggerty, in fact, went on to make, because the predicate for that motion that the defendants made was their assertion in one of their agreed material facts that all of the sponge was transferred to corporate relatives and we were fully reimbursed for our costs. And that's how they got to their pass-on defense, which isn't valid legally, and it isn't valid factually in this case, but certainly even in the arena where they were moving for summary judgment, the fact that not all of the sponge was transferred to corporate relatives meant that the defendants were no longer entitled to summary judgment on that basis. I'm talking about Judge Haggerty sent out his minute order, and then he starts the discussion, and you say, with respect to the first question, we cannot point to any place in the record where it shows precisely to what extent the titanium sponge was used in Ormet's own manufacturing process, and we don't think it has any bearing on the damages theory that Ormet has. And then there's more discussion, and the judge says, when you respond in that fashion, are you suggesting some of the damages would be attributable to the increased costs? Mr. Wilson, absolutely not. The court, absolutely not. Mr. Wilson, absolutely not. That is not the theory of damages. That's the first part, and that's the other. I take that to say you're not saying the kind of damage or injury doesn't exist. That's not the theory you're offering up is how it's really measured. That's correct, and I tried to make that clear very much toward the end, of that oral argument, and I can't give you the pages at this point. I'll go take another look at it. But I did get a chance to revise and extend your remarks. Yes, for which I was grateful. Okay, I'll take another look. But he then ruled against you on that issue by saying that it's not enough to say some without any more information. Yes, and to my mind, that had nothing to do with the underlying basis for the summary judgment motion. Well, it does. Your answer, I mean, you have two answers to the summary judgment motion. One, there are damages for everything. Yes. If you lose on that, then you're a second retreat to the argument. Well, all right, even if you're right about the bulk of it, you can't get summary judgment because some of the product was used for a different purpose. And what the judge said there was it's not enough to say some. You've got to give them more of an idea of how much. That's correct. Was it one house or was it 10 percent? That was the basis. Yes, and another difficulty with that, if you go back to trial on that question, is this is production that was not produced. So it's going to be difficult to determine how much. Well, I think you would have an idea of how much normally, generally. That's correct. We will have records that show the interim. It would have avoided a problem. All right. Thank you very much. The case is submitted. Thank you both very much. The court will now adjourn. This court for this session stands adjourned. Court is adjourned.
judges: Reinhardt, Silverman, Clifton